UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

ELBIT SYSTEMS LTD.,                      :
                                         :     10 Civ. 10 (SHS)
                        Plaintiff,       :
                                         :     <u>OPINION & ORDER</u>
              -against-                  :
                                         :
CREDIT SUISSE GROUP,                     :
                                         :
                        Defendant.       :
-------------------------------------------------------------x

SIDNEY H. STEIN, U.S. District Judge.

   This contract dispute focuses on the meaning and scope of a release of claims negotiated

between Tadiran Communications Ltd. and Credit Suisse Securities (USA) LLC ("CSS").

Plaintiff Elbit Systems Ltd., Tadiran's successor, has sued defendant Credit Suisse Group

("Credit Suisse"), CSS's corporate parent, on claims of securities fraud, common law fraud, and

unjust enrichment. Credit Suisse has now moved for summary judgment in its favor on the

theory that the release signed by Tadiran extinguished Elbit's claims. Because that release was

limited to "known" claims and because a genuine dispute exists about whether Tadiran knew of

the alleged fraud, the Court denies Credit Suisse's motion.

## I.      BACKGROUND

   Unless noted, the parties do not dispute the following facts.

### A.      The parties

   Tadiran Communications Ltd. was an Israeli company that developed and sold radio

equipment for military use. (Def.'s Local Civil Rule 56.1 Statement of Undisputed Facts ("Def.'s

56.1") ¶ 1; Pl.'s Local Civil Rule 56.1 Counterstatement of Undisputed Facts ("Pl.'s 56.1") ¶ 1.)

Tadiran "merged with and into" plaintiff Elbit Systems, becoming its successor-in-interest in July

2008. (Compl. ¶ 23.)

Defendant Credit Suisse is a financial holding company with its principal place of business in Switzerland. (Def.'s 56.1 ¶ 4; Pl.'s 56.1 ¶ 4.) CSS, a wholly-owned subsidiary of Credit Suisse, is a registered broker-dealer. (Compl. ¶ 24; Oral Arg. Tr., Feb. 3, 2012.)

        B.      <u>CSS placed unauthorized securities in Tadiran's account.</u>

In 2004, Tadiran opened a brokerage account with CSS as part of its cash-management strategy and directed CSS to purchase auction rate securities ("ARS") that were backed by government guaranteed paper. (Def.'s 56.1 ¶¶ 5-10; Pl.'s 56.1 ¶¶ 5-10.) At some point, employees of either Credit Suisse or CSS began to purchase ARS that were backed by collateralized debt obligations ("CDO"), instead of being backed by government guaranteed paper. (Def.'s 56.1 ¶ 10; Pl.'s 56.1 ¶ 10.) CSS brokers sent Tadiran trade confirmations that omitted any reference to these securities as CDO-backed ARS. (*See* Confirmation Emails, Ex. 3 to Decl. of Elisabeth Genn dated April 18, 2011; Dep. of Matthew W. Gorman dated Feb. 1, 2011 at 65:6-11, Ex. 2 to Genn Decl.) At least once, however, CSS sent Tadiran a portfolio statement that included "CDO" in the description of certain ARS. (Ex. 9 to Decl. of Lawrence M. Barnes dated March 21, 2011.)

Tadiran first became aware of a problem with the securities in its brokerage account in the summer of 2007, "when it tried to liquidate its holdings." (Def.'s 56.1 ¶ 14; Pl.'s 56.1 ¶ 14.) By the time Tadiran attempted to do so, however, the market for ARS backed by CDOs "had collapsed and become illiquid." (Def.'s 56.1 ¶ 15; Pl.'s 56.1 ¶ 15.)

Because Tadiran's CFO, Ilan Pacholder, believed that Tadiran held ARS that were backed by government securities, he did not understand why Tadiran was unable to sell its ARS. (Def.'s 56.1 ¶ 15-19; Pl.'s 56.1 ¶¶ 15-19.) He therefore contacted Tadiran's broker-dealer, CSS. In response, CSS dispatched Michael Pease and Kevin Randick, directors in CSS's Corporate Cash Management group, to meet with Tadiran about its account. (Def.'s 56.1 ¶¶ 17-18; Pl.'s 56.1 ¶¶ 17-18.)

By September of 2007, Pachholder understood "that the investments were not what they were supposed to be," (Dep. of Ilan Pacholder dated Feb. 4, 2011 at 50:9-12, Ex. 1 to Genn Decl.), insofar as Tadiran had in fact purchased ARS backed by CDOs instead of ARS backed by government paper. (Def.'s 56.1 ¶ 20; Pl.'s 56.1 ¶ 20.) Importantly, the parties agree that "Tadiran gave CSS instructions to purchase ARS[] backed by government guaranteed paper," but that either Credit Suisse or CSS "purchased ARS backed by [CDOs]." (Def.'s 56.1 ¶ 10; Pl.'s 56.1 ¶ 10.) By the time Tadiran attempted to liquidate its holdings, "there were no buyers" in the market. (Pachholder Dep. at 51:14-15; Def.'s 56.1 ¶ 15; Pl.'s 56.1 ¶ 15.)

Matthew Gorman, a CSS Managing Director, wrote a Tadiran employee on September 4, 2007 to inform Tadiran that he had "decided to consolidate coverage of client accounts that hold [ARS] with Michael Pease." (Ex. 14 to Genn Decl.; Gorman Dep. at 50:4-23.) At the time, CSS had placed Tadiran's previous contacts, Julian Tzolov and Steven Butler "on administrative leave." (Gorman Dep. at 51:8-19; Pl.'s Local Civil Rule 56.1 Statement of Additional Material Facts ("Pl.'s Additional 56.1") ¶ 1.) Gorman admits that he did not share this information with Tadiran in his September 4 email, nor did he relay the fact that Tzolov and Butler had "misrepresented securities" to Tadiran. (Gorman Dep. at 50:25-51:7, 52:24; Ex. 14 to Genn Decl.) The only "factor" bearing on the personnel switch that Gorman provided in his September 4 email was "turmoil in the market." (Gorman Dep. at 52:16-19.)

CSS did, however, file public Form U5s for Tzolov and Butler. The Financial Industry Regulatory Authority ("FINRA") requires broker-dealers to file Form U5s to "terminate the registration of an individual" when a FINRA-registered employee departs the firm.[1] In these Form U5s, CSS indicated that Tzolov and Butler had departed the firm after being accused of "violating *investment-related* statutes, regulations, rules or industry standards of conduct." (Exs. 16 ¶ 7F(1) & 17 ¶ 7F(1) to Genn Decl.) But CSS marked "no" in response to the question of

---

[1] The Form U5 Uniform Termination Notice for Securities Industry Registration General Instructions is available at http://www.finra.org/Industry/Compliance/Registration/CRD/FilingGuidance/P005235.

whether the employee departed after allegations of "fraud or the wrongful taking of property." (Exs. 16 ¶ 7F(2) & 17 ¶ 7F(2) to Genn Decl.)

        C.      <u>CSS and Tadiran negotiated a settlement.</u>

The parties then reached a resolution of their dispute. The resolution included a release of claims, which was negotiated, agreed upon, and fully executed. (Def.'s 56.1 ¶¶ 37-42; Pl.'s 56.1 ¶¶ 37-42.) On November 14, 2007, Tadiran executed the release and CSS then wired Tadiran the agreed upon amount of $10,383,203.92. (Def.'s 56.1 ¶¶ 41-42; Pl.'s 56.1 ¶¶ 41-42.)

The executed release reads in full as follows:

<u>**GENERAL RELEASE**</u>

> TO ALL WHOM THESE PRESENTS SHALL COME OR MAY CONCERN, KNOW THAT Tadiran Communications, Ltd. each of their present and former predecessors, successors, parents, subsidiaries, affiliates, directors, officers, employees, agents, representatives, and assigns (collectively, the Releasors), in exchange for the good and valuable consideration described in the letter of Matthew Gorman, dated October 29, 2007, receipt of which is hereby acknowledged, fully and unconditionally release and forever discharge Credit Suisse Securities (USA) LLC, and each of its present and former predecessors, successors, parents, subsidiaries, affiliates, directors, officers, employees, agents, representatives, and assigns (collectively, the "Releasees"), from any and all claims, actions, causes of action, counterclaims, suits, debts, dues, sums of money, bonds, bills, specialties, covenants, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, contracts, liabilities and demands, whatsoever, in law, admiralty or equity, known, fixed or contingent, which against the Releasees, the Releasors ever had, may now have, for, upon, or by reason of any matter, cause or thing whatsoever known to Tadiran Communication concerning its brokerage account with Credit Suisse.

(General Release executed by Tadiran on November 14, 2007 (the "Release"), Ex. A to Decl. of Matthew W. Gorman dated Nov. 4, 2010.)

D.    Elbit now asserts fraud claims related to the unauthorized activities.

In July 2008, CSS stated to the Wall Street Journal that "nearly a year ago" it "detected prohibited activity by two former cash management employees who were immediately suspended." (*See* Stipulation dated Dec. 16, 2010, Ex. 13 to Genn Decl.) In September 2008, Tzolov and Butler were indicted on federal securities fraud charges. *See United States v. Tzolov*, No. 08 Cr. 370 (E.D.N.Y.).

Elbit, Tadiran's successor, then filed its Complaint in May 2009 in the U.S. District Court for the Northern District of Illinois, asserting claims of securities fraud under Rule 10(b)-5 and Section 20(a) of the Securities and Exchange Act of 1934, aiding and abetting common law fraud, and unjust enrichment.[2] Credit Suisse moved to transfer this action to the U.S. District Court for the Southern District of New York; the court granted that request and the action was transferred into this district in early 2010.

Credit Suisse subsequently moved to dismiss the Complaint on the grounds that the Release barred Elbit's fraud claims as a matter of law. On July 8, 2010, the Court denied that motion without prejudice, ordering the parties to undertake limited discovery as to the drafting and effect of the Release. (Order dated July 8, 2010.)

## II.    DISCUSSION

As noted above, Credit Suisse has now moved for summary judgment on the grounds that the Release bars Elbit's claims. Elbit opposes the motion on the grounds that the Release discharges only claims that were "known" to it at the time it entered into the Release and that, at the least, its terms are ambiguous. Elbit contends in the alternative that Credit Suisse fraudulently induced Tadiran to sign the Release.[3]

---

[2] Although Elbit has asserted an unjust enrichment claim, which does not sound in fraud, both parties refer to the claims in the Complaint as "fraud" claims for the purposes of the motion for summary judgment. (*E.g.*, Pl.'s Mem. of Law in Opposition to Summary Judgment ("Pl.'s Opp.") 2; Def.'s Mem. of Law in Support of Summary Judgment ("Def.'s Mem.") 2, 14.) The Court follows the parties' convention.

[3] Because the Court denies Credit Suisse's summary judgment motion, the Court does not reach Elbit's alternative fraudulent inducement argument.

A.   <u>Relevant legal standards</u>

    *1.    Summary judgment is appropriate when there is no genuine dispute of material fact.*

Summary judgment is appropriate only when the evidence shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In determining whether a genuine dispute of material fact exists, the Court "is to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004). Nonetheless, the party opposing summary judgment "may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence" in support of its factual assertions. *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998).

    *2.    New York law governs the Release.*

Although the Release does not contain a choice-of-law clause, both parties utilize New York law to interpret the Release. The Court finds that they have tacitly agreed that New York law governs its terms. *See Albert v. Loksen*, 239 F.3d 256, 264 (2d Cir. 2001); *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 175 (2d Cir. 2000) ("No reason of policy warrants a departure from [the parties'] implied choice-of-law."). Therefore, the Court applies New York law.

    *3.    The Release should be interpreted pursuant to contract interpretation principles.*

Whether the Release bars Elbit's fraud claims is a question of contract interpretation. "In reviewing a written contract, a trial court's primary objective is to give effect to the intent of the parties as revealed by the language they chose to use. . . . When the question is a contract's proper construction, summary judgment may be granted when its words convey a definite and precise meaning absent any ambiguity. . . . The language of a contract is not made ambiguous simply because the parties urge different interpretations." *Seiden Assocs., Inc. v. ANC Holdings,*

*Inc*., 959 F.2d 425, 428 (2d Cir. 1992) (citations omitted). However, where the agreement

contains ambiguous language, evidence external to the contract may be offered by the parties in

an effort to resolve the ambiguity in their favor. *See Kerin v. U.S. Postal Serv.*, 116 F.3d 988, 992

n.2 (2d Cir. 1997).

Determining whether contractual language is ambiguous presents a question of law for the

trial court. *See Sayers v. Rochester Tel. Corp. Supp. Mgmt. Pension Plan*, 7 F.3d 1091, 1094 (2d

Cir. 1993). Contractual language is deemed ambiguous when it is

> capable of more than one meaning when viewed objectively by a
> reasonably intelligent person who has examined the context of the
> entire integrated agreement and who is cognizant of the customs,
> practices, usages, and terminology as generally understood in the
> particular trade or business.

*Id.* at 1095 (quoting *Walk-in Medical Ctrs., Inc. v. Breuer Capital Corp*., 818 F.2d 260, 263 (2d

Cir. 1987)). Moreover, "a contract may be ambiguous when applied to one set of facts but not

another." *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 178

(2d Cir. 2004) (quoting *World Trade Ctr. Props., L.L.C. v. Hartford Fire Ins. Co.*, 345 F.3d 154,

184 (2d Cir. 2003)).

Under New York law, a release must be construed in accordance with the intent of the

parties who executed it. *Gross v. Sweet*, 49 N.Y.2d 102, 108 (1979). A release will not be given

effect unless it contains an "explicit, unequivocal statement of a present promise to release [a

party] from liability." *Bank of Am. Nat'l Trust & Sav. Ass'n ex rel. Zanuck v. Gillaizeau*, 766 F.2d

709, 713 (2d Cir. 1985) (internal quotation marks omitted). "Moreover, because the law looks

with disfavor upon agreements intended to absolve a party from the consequences of his

wrongdoing, a release which purports to excuse a party from responsibility for misconduct is

subject to the closest of judicial scrutiny." *Golden Pac. Bancorp v. F.D.I.C.*, 273 F.3d 509, 515

(2d Cir. 2001) (applying New York law) (internal quotation marks omitted).

     **B.**    <u>The Release does not bar Elbit's claims unless it understood that it had these</u>
<u>claims at the time it signed the release.</u>

Elbit urges that "the release applies to only known claims, and not to unknown claims or claims Elbit should have known about." (Pl.'s Mem. of Law in Opposition to Summary Judgment ("Pl.'s Opp.") 17.) Credit Suisse does not interpret the Release otherwise. It agrees that the Release only applies to claims that were known at the time the parties entered into the Release. (*E.g.*, Def.'s Mem. of Law in Support of Motion for Summary Judgment ("Def.'s Mem") 1-2.)

       *1.*    *The Release releases all claims "known to Tadiran Communications*
           *concerning its brokerage account at Credit Suisse."*

The starting point for contract interpretation is the text itself. *See Seiden Assocs., Inc.*, 959 F.2d at 428. The Release twice employs the word "known." The first instance follows a list of permutations of the word "claim" (for example, "causes of action," "damages," and "liabilities"). Specifically,  the Release defines the scope of  the claims within its reach as "any and all claims . . . whatsoever, in law, admiralty and equity . . . ." Then, the Release limits "any and all claims" to those "known," whether "fixed or contingent." It also reaches "any and all claims . . . [Tadiran] ever had [or] may now have . . . ." Based on the context, the Court finds the first use of the term "known" unambiguously modifies the phrase "any and all claims" and its permutations.

The second instance of "known" appears at the end of the Release. That final section also modifies "any and all claims," but does so with respect to the factual dimensions of the claim: "any and all claims . . . for, upon, or by reason of any matter, cause or thing whatsoever *known* to Tadiran Communication concerning its brokerage account with Credit Suisse." (Emphasis added.) In other words, the Release only releases claims known to Tadiran "concerning its brokerage account."

Put together, the two uses of "known" in the Release create two conditions for a claim to be released: (1) the claim must have been known to Tadiran and (2) it must have been known to Tadiran to concern Tadiran's "brokerage account with Credit Suisse."

###### 2.     *Credit Suisse's interpretation of the Release is flawed.*

The crux of the parties' dispute is whether or not Tadiran needed to know of the claims Elbit asserts in the Complaint at the time Tadiran signed the Release. (*See* Pl.'s Opp. 17; Def.'s Reply Mem. in Further Support of Motion for Summary Judgment ("Def.'s Reply") 2.)  Elbit reads the first use of the term "known" to require that Tadiran needed to be aware of the claims it was releasing. Credit Suisse contends that "Tadiran did not need to know that it had a specific *kind* of claim arising from unauthorized trading in its ARS account"; it just needed to know that it had some claim "concerning its brokerage account with Credit Suisse." (Def.'s Mem. 11 (emphasis in original).) But the Release contains express limits on its scope that run counter to Credit Suisse's interpretation.

###### a.     Credit Suisse fails to give both "known" clauses meaning.

Credit Suisse contends that the text of the Release unambiguously captures—and therefore releases—Elbit's fraud claims. Credit Suisse's argument is this: The Release extinguishes any known claim arising from "any matter, cause or thing whatsoever known to Tadiran Communication concerning its brokerage account with Credit Suisse." Because Tadiran knew of the unauthorized purchases in its brokerage account of ARS backed by CDOs before it executed the Release, Credit Suisse continues, Tadiran released all claims based on this misconduct—even if Tadiran did not know all of the underlying facts about the claim or exactly what the claim was. (Def.'s Mem. 2.)

However, Credit Suisse's view fails to give meaning to both uses of the word "known." Based on the Release's terms, Tadiran released all *known* claims out of any matter *known* to Tadiran concerning its brokerage account. Credit Suisse's view focuses on what Tadiran knew concerning its brokerage account to the exclusion of the contract's simultaneous—and additional—requirement that Tadiran must know the specific claim it was releasing. A court is obligated to interpret a contract in a way that gives meaning to every term. *See Paneccasio v.*

*Unisource Worldwide, Inc.*, 532 F.3d 101, 111 (2d Cir. 2008). Thus, the Court rejects Credit Suisse's view.

Credit Suisse, perhaps anticipating such a conclusion, offers the Court an example to illustrate its reading. Credit Suisse suggests that Elbit would be able to pursue a claim for embezzlement from Tadiran's brokerage account unrelated to the ARS issue. (Def.'s Mem. 20-21.) Credit Suisse contends that the Release would not bar such a claim because it "would not have arisen out of anything that Tadiran knew about its brokerage account . . . ." (Def.'s Mem. 21.) But this example actually reinforces Elbit's position that Tadiran released only known claims: Why would the Release's terms discharge an unknown fraud claim but not an unknown embezzlement claim, when each is a claim "concerning its brokerage account with Credit Suisse"? Credit Suisse responds that its example proposes a claim "independent[] of any unauthorized purchases of ARS." (*Id.*) However, if the Release bars every claim related to the purchase of ARS, then the first use of "known" could be omitted without any change to the Release's meaning.

In fact, Credit Suisse often does omit the first instance of "known" when attempting to summarize the Release. (*E.g.*, Def.'s Reply 3; Def.'s Mem. 1.) These strategic omissions simply draw attention to the gap in Credit Suisse's interpretation. Accordingly, Credit Suisse misses the point when it contends that "[t]here is simply no dispute that Tadiran *knew* about the unauthorized purchases of certain ARS in its account and the falsity of certain specific communications it had received from its brokers regarding those transactions . . . ." (Def.'s Mem. 2 (emphasis in original).) Those facts only speak to the Release's condition that the claims concern matters "known" to Tadiran about its brokerage account. Because the Release simultaneously limited itself to "any and all claims . . . known . . . .", however, Credit Suisse has failed to account for both phrases.

Finally, Credit Suisse points to *Middle East Banking Co. v. State Street Bank International*, among other authorities, for the idea that a release must be construed against the releasor. 821 F.2d 897, 907 (2d Cir. 1987). But *Middle East Banking* states the rule as one applying to a

release of "general effect." *Id.* Even Credit Suisse admits that the Release here had limits, and is thus not of general effect. *Cf. Kraft Foods Inc. v. All These Brand Names, Inc.*, 213 F. Supp. 2d 326, 329-30 (S.D.N.Y. 2002) (considering release without any limitations) (cited by Credit Suisse at Def.'s Mem. 12). Moreover, Credit Suisse bears the burden to demonstrate that the Release "contain[s] an explicit, unequivocal statement of a present promise to release defendant from liability." *Bank of Am. Nat'l Trust & Sav. Ass'n ex. rel. Zanuck v. Gillaizeau*, 766 F.2d 709, 713 (2d Cir. 1985) (applying New York law). Credit Suisse has failed to show that the text supports its view, let alone that it "explicit[ly]" and "unequivocally" does so.

b.      The Release is not unlimited in scope.

Credit Suisse's principal argument, beyond the text, is that the breadth of the language used to discharge CSS's liability was intended to encompass any claim concerning the unauthorized purchases of ARS. Without doubt, CSS and Tadiran aimed to resolve their differences and they employed broad language in the Release to achieve that aim. But that general language must be limited by the effect of terms, such as "known," that bound it. *See Lexington Ins. Co. v. Combustion Eng'g, Inc.*, 264 A.D.2d 319, 322 (1st Dep't 1999) ("Where the language of a release is to be limited to only particular claims, demands, or obligations, the instrument will be operative as to those matters alone, and will not release other claims, demands or obligations.") (internal quotation marks omitted).

Seizing on the broadest language in the release—particularly the phrase "any and all claims"—Credit Suisse proffers two New York authorities that interpret general releases to bar unknown claims or underestimated injuries. But these two cases, *Mangini ex. rel. Mangini v. McClurg*, 24 N.Y.2d 556, 562 (1969), and *Verstreate v. Cohen*, 242 A.D.2d 862, 863 (4th Dep't 1997), analyze settlement instruments that do not limit themselves to "known" claims. *Mangini*, 24 N.Y.2d at 561; *Verstreate*, 242 A.D.2d at 863. In fact, *Verstreate* explicitly involves the release of claims "known and unknown." 242 A.D.2d at 863. Moreover, the plaintiffs in *Mangini* and *Verstreate* sought to avoid their respective settlements on the grounds of mutual mistake.

11

*Mangini*, 24 N.Y.2d at 561; *Verstreate*, 242 A.D.2d at 862. Neither of these circumstances exists here.

Similarly, Credit Suisse argues that the Release touches every claim "within the contemplation of the parties when they execute[d] the release." (Def.'s Mem. 16.) For this, Credit Suisse relies on *RBS Holdings, Inc. v. Wells Fargo Century, Inc.*, 485 F. Supp. 2d 472 (S.D.N.Y. 2007). The agreement in *RBS Holdings* is quite similar to the Release here. As in *Mangini*, however, the *RBS Holdings* release had no explicit limit to known claims and a plaintiff who argued avoidance. *Id.* at 475-76. If Tadiran had signed an unlimited release, or if Elbit contended that it could avoid the textual consequences of the release Tadiran did sign, then *RBS Holdings* might be persuasive. But Tadiran did not sign such a settlement nor does Elbit argue avoidance here. Instead, Elbit asserts—and the Court agrees—that the text of the Release specifically carves out claims that were not "known" to Tadiran at the time it entered into the Release.

3.      *The Release should be interpreted according to the plain meaning of the word "known."*

In the absence of ambiguity, the Court will employ the common meaning of "known." *See United States v. Broad. Music, Inc.*, 275 F.3d 168, 175 (2d Cir. 2001) (To the extent a term is unambiguous, "deference is to be paid to the plain meaning of the language of a decree and the normal usage of the terms selected.") (internal quotations omitted). Even though the plain language of the Release favors Elbit's position, Elbit nevertheless contends that the Release is ambiguous. It encourages the Court to consider parol evidence, which may be consulted when a contract's language is capable of more than one meaning when viewed objectively. *Sayers v. Rochester Tel. Corp. Supp. Mgmt. Pension Plan*, 7 F.3d 1091, 1095.

There is no ambiguity here. Elbit rests its argument for ambiguity on the observation that the Release is "plainly not susceptible to only [Credit Suisse's] interpretation." (Pl.'s Opp. 17.) In fact, the Release is not susceptible to Credit Suisse's interpretation. Of the two possible readings of the disputed language—whether Tadiran needed to "know" the claims it was releasing—only

Elbit's reading accounts for the two uses in the Release of the word "known." Therefore, Credit Suisse's view cannot create an ambiguity. *United Nat'l Ins. Co. v. Waterfront N. Y. Realty Corp.*, 994 F.2d 105, 109 (2d Cir. 1993) (no ambiguity where alternative interpretation "would violate the principle that meaning and effect should be given to all terms of a contract"). Elbit also argues that *Golden Pacific Bancorp v. F.D.I.C.* compels a finding of ambiguity. 273 F.3d 509 (2d Cir. 2001). In *Golden Pacific*, the Court of Appeals for the Second Circuit found a release to be ambiguous with respect to whether the asserted claim arose out of the event covered by the settlement. *Id.* at 516. By contrast, neither party here disputes that Elbit's fraud claims relate to the events covered by the Release. *Golden Pacific* presents no reason to find an ambiguity.

For a word's plain meaning, New York courts commonly look to the dictionary definition. *See Fed. Ins. Co. v. Am. Home Assurance Co.*, 639 F.3d 557, 567 (2d Cir. 2011); *Mazzola v. Cnty of Suffolk*, 143 A.D.2d 734, 735 (2d Dep't 1988). Black's Law Dictionary defines "known" as "Familiar; perceived; recognized; understood; especially, when used absolutely, familiar to all; generally understood or perceived. Term may, according to context, refer to both actual and constructive knowledge." Black's Law Dictionary 873 (6th ed. 1990); *see also* Oxford English Dictionary (3d ed. 2010) (Known: "That has become an object of knowledge; that is or has been apprehended mentally; learned; familiar; *esp.* generally or widely known or recognized, familiar to all, renowned."). Thus, the Court interprets the Release to have released Elbit's fraud claims if Tadiran (1) "recognized" or "understood" that it had a claim (or cause of action or damages) for fraud and (2) that claim concerned matters that Tadiran "recognized" or "understood" about its brokerage account.

The Court notes that, even if there were an ambiguity as to whether Tadiran released only "known" claims, the extrinsic evidence reinforces the text. Specifically, the draft documents show that Elbit and Credit Suisse intended to release only known claims and not to release unknown claims. In the drafting process, the parties removed "unknown" from the phrase "any and all claims . . . known or unknown," effectively limiting "any and all claims" to those "known." (Documents from Drafting of Release, Ex. A to Pl.'s Opp.) Similarly, Tadiran rejected

the insertion of the phrase "should have known" into the contract, once more leaving only "known" in its place. (*Id.*) Given this evidence, the drafting history supports the same reading indicated by the text alone—that Tadiran released only claims (1) known to it and (2) that concerned its brokerage account.

C.   <u>Whether Tadiran had knowledge of the fraud is an issue of fact.</u>

The parties agree that Elbit's claims in the Complaint concern the unauthorized ARS in Tadiran's brokerage account. (Def.'s Mem. 1-2; Pl.'s Opp. 4.) Therefore, the only remaining issue is whether Tadiran knew that it had a fraud claim against Credit Suisse at the time it signed the Release.

Credit Suisse urges the Court to find that Tadiran "knew enough of the basic building blocks of a fraud claim to qualify the claim as 'known.'" (Def. Reply. Mem. 3.) It stresses that Tadiran knew that it had received false email confirmations and knew that its CSS brokers had improperly purchased ARS that were backed by CDOs against its instructions. (*Id.*) A jury could conclude that, based on this information, Tadiran "recognized" or "understood" that it had been defrauded. The evidence at trial may indeed reveal that Tadiran understood at the time of the Release that it had been damaged by fraud. Nevertheless, a jury might also credit Elbit's position that Tadiran had been led by CSS and Credit Suisse to believe that the purchase of ARS backed by CDOs instead of ARS backed by government guaranteed paper had been a negligent mistake, not a fraud. In particular, Gorman's deposition testimony regarding the Form U5s and the decision to switch brokers for the Tadiran account is evidence that a jury could use to conclude that Credit Suisse successfully concealed fraud. Nothing more is required to defeat summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

Therefore, taking "known" at its plain-language meaning, the Court finds a triable issue of fact on whether or not Tadiran "knew" it had "claims, actions, causes of action, . . . suits, . . . damages, . . . [or] demands" for fraud and unjust enrichment against defendant at the time it entered into the Release. This is an issue of fact to be resolved at trial.

14

## III.    CONCLUSION

Because the Release was explicitly limited to known claims and because a genuine dispute exists as to whether Elbit's predecessor knew it had the claims Elbit asserts in the Complaint at the time the Release was executed, Credit Suisse's motion for summary judgment is denied.

Dated: New York, New York
        February 7, 2012

SO ORDERED:

Sidney H. Stein, U.S.D.J.

15