UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ELBIT SYSTEMS, LTD.,

                    Plaintiff,

     -against-

CREDIT SUISSE GROUP,

                    Defendant.

10 Civ. 10 (SHS)

OPINION & ORDER

---

SIDNEY H. STEIN, U.S. District Judge.

    This securities fraud action hinges on the presence of an agency relationship between a broker-dealer and its corporate parent. Plaintiff Elbit Systems Ltd. has sued defendant Credit Suisse Group ("CSG") for securities fraud, aiding and abetting common law fraud, and unjust enrichment. Elbit seeks to hold CSG liable for the conduct of two brokers at its subsidiary, Credit Suisse Securities (USA) LLC ("CSS"). CSG has now moved to dismiss the Complaint on the theory that, in essence, Elbit should have sued CSS directly. To this end, CSG contends that it is not a "control person" of CSS, nor is CSS its agent. Because Elbit has adequately alleged that CSS acted with actual authority as CSG's agent, however, the Court denies CSG's motion to dismiss.

## I. BACKGROUND

    The following facts are as alleged in the Complaint and are taken as true solely for the purposes of this motion.

### A. The parties

Plaintiff Elbit Systems Ltd. is a publicly-traded Israeli defense electronics corporation that is the successor-in-interest to Tadiran Communications Ltd.[1] (Compl. ¶¶ 22-23.)

CSG is a major global banking institution with six primary offices, including one in New York City. CSG is also the ultimate corporate parent of CSS, a broker-dealer. (*Id*. ¶ 24.) CSG has three "global divisions," including Private Banking. (*Id*. ¶ 25.) The Private Banking division includes the Corporate Cash Management Group. (*Id*.) Notwithstanding the distinction between CSG and CSS, Elbit conflates the two entities by referring to them both simply as "Credit Suisse." (*See id*. ¶ 1.) Certain uses of "Credit Suisse" reflect the business or marketing choices of CSS or CSG. Others reflect Elbit's pleading strategy.

### B. The alleged fraud

Tadiran opened an account with either CSS or CSG after a sales pitch by "a broker from Credit Suisse's Corporate Cash Management Group." (Compl. ¶ 26.) The initial written presentations made to Tadiran bore the "Credit Suisse" name and the CSG logo. (*Id*. ¶ 77(d).) The broker advertised investments in auction rate securities (ARS) that would be "safe, liquid, and guaranteed by the United States government." (*Id*. ¶ 27.) The broker never mentioned that ARS auctions could fail and instead represented that "investors could freely liquidate their holdings." (*Id*.) The broker did not mention collateralized debt obligations ("CDOs") or credit-linked note ("CLN") securities. (*Id*.)

For its part, Tadiran told the unidentified CSS or CSG representative that "liquidity and capital preservation were critical" and that it would accept "a lower yield" on its investments in exchange. (*Id*. ¶ 28.) The representative stated that ARS offered Tadiran "a very liquid marketplace" and "no fluctuation in principal value." (*Id*. ¶ 27.) Persuaded, Tadiran created a Corporate Cash Management account,

---

[1] Tadiran merged into Elbit in July 2008. (Compl. ¶ 23.)

selected the "most conservative of the five investment objectives" (*id*. ¶ 28), and transferred $31,000,000 to the account (*id*. ¶ 30).

Initially, "Credit Suisse" followed Tadiran's instructions and purchased primarily ARS backed by federally guaranteed student loans. Beginning in early 2007, however, either CSG or CSS began to replace ARS backed by federally guaranteed student loans with ARS backed by CDO or CLN securities. (*Id*. ¶ 34.) The cash managers purchased these securities even though Tadiran had allegedly "explicitly declined" CSS's or CSG's offer to discuss CDOs because Tadiran "had determined that CDOs carried an unacceptable degree of risk." (Compl. ¶ 35.) Nonetheless, by late July 2007, Tadiran's account contained "the very worst ARS on the market." (*Id*. ¶ 37.)

Neither CSS nor CSG ever disclosed that one of them had shifted Tadiran's investments away from ARS backed by federally guaranteed student loans to ARS backed by CDOs and CLNs. Instead, Tadiran's brokers sent "doctored email confirmations" (*id*. ¶ 36) and inventory listings to Tadiran "from which the term 'CDO' was purposefully omitted and replaced with the term, 'Funding'" (*id*. ¶ 43). CSS or CSG also "deliberately concealed the fraud." (*Id*. ¶ 36.) Neither CSG nor CSS ever sent "prospectuses and product information" concerning the securities in Tadiran's account. (*Id*. ¶ 51.) Neither CSG nor CSS ever provided Tadiran with access to "daily, real-time online information" about its holdings. (*Id*. ¶ 54.)

The auctions for the securities in Tadiran's account began to fail in August 2007. (Compl. ¶ 38.) Neither CSS nor CSG alerted Tadiran to the failed auctions. Instead, Tadiran's brokers increased Tadiran's holdings of "toxic assets" after the auctions first failed—transferring at least one $1.95 million credit-linked note from another customer's account to Tadiran's account. (*Id*.) The note failed at auction within a matter of days.

Tadiran discovered that it held risky CDO- and CLN-backed securities only after the market for such securities had begun to collapse. (*Id*. ¶¶ 38-39.) Tadiran instructed its brokers to liquidate its entire portfolio "once ARS auctions began to fail in August 2007." (*Id*. ¶ 41.) CSS or CSG then sold everything other than CDO- and CLN-backed securities. Those

3

securities could not be sold and remain unsold, at least as of the filing of the Complaint. (*Id*. ¶ 41.) In the end, the losses in Elbit's Corporate Cash Management account totaled nearly $16 million. (*Id*. ¶ 1.)

### C. The cover-up

Elbit further contends that the "auction failures . . . did not mark the end of Credit Suisse's fraudulent scheme." (*Id*. ¶ 65.) Rather, the scheme continued as a "cover up" designed to "conceal the fraudulent scheme as a whole" and "to blame [Corporate Cash Management] clients for what had happened." (*Id*. ¶¶ 65-66.)

For example, CSS or CSG "continued to misrepresent the securities to Tadiran and other victims." (*Id*. ¶ 66.) CSS or CSG also "misrepresented to Tadiran the whereabouts of the Corporate Cash Management Group directors who had handed the account," saying they were busy or away, when in fact they had been "placed on administrative leave owing to the investigation of their fraudulent sales practices." (*Id*. ¶ 67.) At the end of August 2007, Matthew Gorman, head of CSS's New York office, contacted Tadiran to assure it that "the security was merely experiencing temporary illiquidity and was likely to retain its full value." (*Id*. ¶ 68.) Gorman shortly thereafter informed Tadiran that its account would no longer be handled by its former brokers, Julian Tzolov and Eric Butler, but would instead be handled by "one of our most experienced cash managers" because of the "turmoil in the market." (*Id*. ¶ 69 (quotation marks omitted).)

Gorman's statement allegedly was misleading. According to the Complaint, Tzolov and Butler had departed "Credit Suisse" after having been accused of defrauding customers. (*Id*. ¶¶ 70-71.) Despite that fact, the FINRA Form U-5s for Tzolov and Butler filed by CSS did not indicate that Tzolov and Butler had left CSS after being accused of fraud or that "Credit Suisse" had launched an investigation into Tzolov and Butler's conduct.[2] (*Id*. ¶¶ 69-72.)

---

[2]   Although Elbit alleges that "Credit Suisse" filed the Form U-5s, the documents reveal that they were filed by CSS. (Exs. 16-17 to Decl. of Elisabeth Genn in Support of Motion for Summary Judgment, Dkt. No. 37.) The Court considers the actual Form U-

CSG's role in the aftermath of the fraud "was to keep the fraudulent scheme hidden from the public, the federal authorities, and from the victims themselves, for as long as possible." (*Id*. ¶ 72.) Thus, CSG did not correct an October 2007 Wall Street Journal story that quoted either Tzolov's or Butler's attorney to the effect that only one misleading email had been sent, even though CSG knew the attorney's comment to be false. "Credit Suisse" instead said that it was still reviewing the matter. (*Id*.) But in July 2008, "Credit Suisse" admitted in a Wall Street Journal story that it had detected "prohibited activity" by two brokers nearly a year before. (*Id*.)

### D.  The relationship between CSS and CSG

CSG wholly owns CSS. (*Id*. ¶ 77(a).) It incorporates CSS's financial statements into its own. (*Id*.) CSG holds itself out as "an integrated global bank" (*id*. ¶ 77(c)) that operates through "three global divisions—private banking, investment banking, and asset management" (*id*. ¶ 77(e) (quotations omitted)). CSG "describes its operations in cities including New York as its local offices." (*Id*. ¶ 77(f) (quotations omitted).) It also lists as one of its "Main Offices" the New York office of Credit Suisse Securities. (*Id*. ¶ 77(f).) The CEO of Credit Suisse Group's investment bank served as a CEO and Board Member for Credit Suisse Securities; the CEO of Asset Management and Credit Suisse Americas for Credit Suisse Group served as a CEO and Board Member of Credit Suisse Securities. (*Id*. ¶ 77(g).) CSG's CEO primarily works out of CSS's New York office. (*Id*. ¶ 77(h).)

### E.  The claims

Elbit asserts that CSS and "corrupt" CSS brokers "committed an intentional and reckless violation" of Section 10(b) of the 1934 Securities and Exchange Act. Elbit alleges that CSG is liable for CSS's fraud on two theories. First, CSG may be held responsible because CSS had been acting as CSG's agent. (Compl. ¶¶ 98-100 ("First Cause of Action").) Second, CSG is liable for CSS's fraud because it is a "controlling person" of CSS within the meaning of Section 20(a) of the 1934 Securities and Exchange Act. (*Id*.

---

5s because they are public records and Elbit has incorporated them into its Complaint by reference. *See Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000).

¶¶ 102-105 ("Second Cause of Action").) Elbit also alleges two common law claims, aiding and abetting common law fraud (*Id*. ¶¶ 106-107 ("Third Cause of Action")) and unjust enrichment (*Id*. ¶¶ 108-110 ("Fourth Cause of Action")).

### F. This action

Elbit—Tadiran's successor by merger—filed this Complaint in May 2009 in the U.S. District Court for the Northern District of Illinois. CSG then successfully moved to transfer this action to the U.S. District Court for the Southern District of New York for the convenience of the parties and witnesses, in the interest of justice, pursuant to 28 U.S.C. § 1404(a).

CSG subsequently moved to dismiss the Complaint principally on the basis that a contractual release barred Elbit's fraud claims as a matter of law. (Dkt. No. 5.) On July 8, 2010, the Court denied the motion to dismiss without prejudice, ordering the parties to undertake limited discovery as to the drafting and effect of the release. (Dkt. No. 14.) CSG subsequently moved for summary judgment in its favor on the grounds that the release barred Elbit's claims. (Dkt. No. 21.) The Court denied that motion because the record demonstrated a genuine dispute as to whether Elbit knew of the claims it asserts here at the time it signed the release. *Elbit Sys. Ltd. v. Credit Suisse Group*, 842 F. Supp. 2d 733 (S.D.N.Y. 2012). CSG has now renewed its motion to dismiss.

## II. STANDARD OF REVIEW

In evaluating a motion to dismiss a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), a court accepts the truth of the facts alleged in the complaint and draws all reasonable inferences in the plaintiff's favor. *Wilson v. Merrill Lynch & Co., Inc.*, 671 F.3d 120, 128 (2d Cir. 2011). To survive a motion to dismiss, a complaint must set forth "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Int'l Fund Mgmt. S.A. v. Citigroup Inc.*, 822 F. Supp. 2d 368, 376 (S.D.N.Y. 2011). A complaint is "plausible on its face" when it contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability

requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556).

## III. DISCUSSION

### A. Primary Violator Liability

#### 1. Elements

To state a claim pursuant to Section 10(b) and its implementing regulation, Rule 10b–5, "a plaintiff must allege that, in connection with the purchase or sale of securities, the defendant made material misstatements or omissions of material fact, with scienter, and that the plaintiff's reliance on the defendant's actions caused injury to the plaintiff." *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 765 (2d Cir. 2010). A complaint must "state with particularity sufficient facts" to support allegations that a given statement or omission was misleading. *Novak v. Kasaks*, 216 F.3d 300, 312 (2d Cir. 2000); *see* 15 U.S.C. § 78u–4(b)(1). A complaint must also allege particularized facts that give rise to a "strong inference" of scienter, which is an "inference of scienter [that is] cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

#### 2. Agency

Elbit contends that CSG should answer for the misconduct at CSS, its broker-dealer subsidiary, on two different agency theories. First, that CSS was acting as CSG's agent. Second, that CSG led Tadiran to believe that CSS was acting as CSG's agent.

CSG contends that the heightened pleading requirements of Rule 9(b)—that allegations *of fraud* must be set forth "with particularity"—should apply to Elbit's allegations that CSS should be held to be the agent of CSG. (Def.'s Mem. 16.) But the alleged agency relationship between CSG and CSS is not itself alleged to have been a fraud, as was the case in *Kolbeck v. LIT America, Inc.*, 923 F. Supp. 557, 569 (S.D.N.Y. 1996). Therefore, the Court will employ the ordinary pleading standard to the question of

whether Elbit has properly pled that CSS should be held to be CSG's agent. The Court concludes that Elbit has done so.

> *a. Elbit has alleged that CSS had actual authority to act on behalf of CSG.*

"Establishment of [an agency] relationship requires facts sufficient to show (1) the principal's manifestation of intent to grant authority to the agent, and (2) agreement by the agent. In addition, the principal must maintain control over key aspects of the undertaking." *Commercial Union Ins. Co. v. Alitalia Airlines, S.p.A.*, 347 F.3d 448, 462 (2d Cir. 2003) (citations omitted). Agency reflects mutual consent: "the agent must consent to act subject to the principal's direction and control, and the principal must consent to exercising control over the agent." *Global Entm't, Inc. v. N.Y. Tel. Co.*, No. 00 Civ. 2959, 2000 WL 1672327, at *6 (S.D.N.Y. Nov. 6, 2000).

Elbit pleads the following indicia of agency by CSS in its Complaint:

- CSS is CSG's wholly owned subsidiary. (Compl. ¶ 77(a).) CSS and CSG use the same email suffixes and corporate logo (*Id.* ¶ 77(e).)

- "Credit Suisse Group describes its operations in cities including New York as its 'local offices,' not separate companies. Likewise, Credit Suisse Group lists six 'Main Offices' on its website, . . . one of which is in fact the New York office of Credit Suisse Securities." (*Id.* ¶ 77(f).)

- The CEO of CSG's investment bank serves as "a CEO and Board Member for [CSS]"; the "CEO of Asset Management and Credit Suisse Americas for Credit Suisse Group" serves as "a CEO and Board Member of [CSS]." (*Id.* ¶ 77(g).)

- CSG operates through three global divisions, including Private Banking, within which the Corporate Cash Management Group and its employees operate. (*Id.* ¶¶ 16, 25.)

- CSG "controlled Credit Suisse Securities and exercised managerial authority with respect to the Corporate Cash Management Group." (*Id.* ¶ 16.) Tzolov and Butler "led" the Corporate Cash Management Group. (*Id.* ¶ 12.)

- CSG promulgated a Code of Conduct that established "the framework within which Credit Suisse Group and all its subsidiaries . . . directors and employees[] conduct business." (*Id.* ¶ 85.) Moreover, CSG executives expressed "concerns" about the Corporate Cash Management Group's sale of CDOs, as well as the "quality of suitability review" that group conducted. (*Id.* ¶ 14.)

- CSG announced publicly the promotions of Tzolov and Butler to "director" positions at Credit Suisse First Boston. (Ex. 3 to Compl.)

Taken together, these statements plausibly allege that CSS had actual authority to transact business as CSG's agent at CSG's "local office." CSG argues—correctly—that a parent-subsidiary relationship does not by itself create a presumption of agency, nor does the use of a shared brand identity. But those features, combined with Elbit's allegations that the CSS brokers who serviced Tadiran's account led the Corporate Cash Management group; that the Corporate Cash Management group reported to CSG; and that CSG reviewed that group's sale of CDOs, decidedly move the agency theory from possible to plausible. *Accord STMicroelectronics v. Credit Suisse Grp.*, 775 F. Supp. 2d 525, 539 (E.D.N.Y. 2011).

In particular, the Complaint alleges that CSS acted subject to CSG's control (*e.g.*, Compl. ¶¶ 16, 25, 90), which is "[a]n essential characteristic of an agency relationship." *In re Shulman Transp. Enters., Inc.*, 744 F.2d 293, 295 (2d Cir. 1984). This distinguishes the Complaint from the allegations in *Maung Ng We & Massive Atl. Ltd. v. Merrill Lynch & Co.*, No. 99 Civ. 9687, 2000 WL 1159835 (S.D.N.Y. Aug. 15, 2000). There, the court concluded that allegations that one corporation encouraged and ratified the acts of another did not suggest an agency relationship. *Id.* at *4. By contrast, Elbit contends that CSG did more than encourage and ratify CSS's actions. It alleges that CSG intervened in the aftermath of Tzolov and Butler's misconduct and directed CSS's response. (*E.g.*, Compl. ¶ 90.) That allegation, and the allegations that CSG was "directly responsible" for aspects of CSS's compliance program, and that compliance executives overlapped, supports the inference that CSG had the ability to stop the alleged wrongdoing at CSS (*id.* ¶ 86). In sum, the Complaint contains enough factual allegations to allege plausibly that CSS had actual authority to act as CSG's agent.

> b. *Elbit has not sufficiently alleged that it reasonably relied on any "apparent authority" conferred by CSG.*

Apparent authority "arises from the written or spoken words or any other conduct of the principal which, reasonably interpreted, causes a third person to believe that the principal consents to have an act done on his behalf by the person purporting to act for him." *Minskoff v. Am. Exp. Travel Related Servs. Co.*, 98 F.3d 703, 708 (2d Cir. 1996) (brackets and quotation marks omitted).

Apparent authority is not adequately alleged to be present here, for two reasons.

First, the Complaint does not plausibly allege that CSG held CSS out to third parties as its agent. The Complaint contains no allegations that CSG made any representations about CSS's authority to Tadiran. In fact, it proves difficult to isolate in the Complaint any statements that CSG directly made to Tadiran.

Second, regardless of whether the Complaint alleges that CSG held CSS out as its agent, it does not allege that Tadiran reasonably relied on that apparent authority. The closest allegation Elbit points to in its Complaint is that the "two initial written presentations made to Tadiran regarding student loan securities bore the 'Credit Suisse' name and Credit Suisse Group corporate logo, making no mention whatsoever of Credit Suisse Securities." (Compl. ¶ 77(d).) Elbit never follows that statement with a factual allegation that Tadiran relied on those presentations, or any others, in concluding that CSS was held out by CSG as its agent. Elsewhere, Elbit references only "Credit Suisse."

Elbit's tactical decision to conflate CSS and CSG mires the Complaint in confusion. For example, Elbit alleges that "Based on Credit Suisse's representations, Tadiran transferred a total of $31,000,000 to Credit Suisse for it to invest . . . ." (*Id.* ¶ 3.) But Elbit sets forth explicitly in the Complaint's first paragraph that it uses the words "Credit Suisse" to refer to CSG and CSS "jointly." The Court, therefore, is taxed with the vexing task of deciphering whether Tadiran is alleging that it relied on CSG's representations, or CSS's, and whether it thought it had transferred funds to CSG or CSS. As a result, the Court cannot credit this statement as an

allegation that Elbit relied on CSG's representations that CSS was its agent. Nor can the Court blink at Elbit's obfuscation on the grounds that CSG controls the facts. (*See* Pl.'s Opp. 17 n.15.) The factual basis for Tadiran's reliance on CSS as the apparent agent of CSG is within plaintiff's knowledge, not CSG's.

Without any allegation of reliance, or allegations that CSG cloaked CSS in apparent authority, Elbit's apparent authority claim fails. *See, e.g., Herbert Constr. Co. v. Cont'l Ins. Co.*, 931 F.2d 989, 993-94 (2d Cir. 1991). The Court concludes that the Complaint alleges that CSS acted with actual authority as CSG's agent; it does not allege that CSS acted with apparent authority.

### 3.   *Central Bank & Janus*

CSG next contends that U.S. Supreme Court precedent forecloses respondeat superior liability for the acts of its alleged agent, CSS. It does not.

First, CSG urges the Court to interpret *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.* as eliminating respondeat superior liability. 511 U.S. 164 (1994). But *Central Bank* abolished aiding and abetting liability for Section 10(b) violations on the theory that Section 10(b) did not prohibit aiding and abetting conduct. *In re Parmalat Sec. Litig.*, 474 F. Supp. 2d 547, 551 (S.D.N.Y. 2007); *see Central Bank*, 511 U.S. at 178 ("[T]his case concerns the conduct prohibited by §10(b).") As U.S. District Judge Lewis A. Kaplan has observed, respondeat superior is not a theory of liability based on the defendant's conduct; rather, it is liability based on the defendant's status. *In re Parmalat*, 474 F. Supp. 2d at 550-51. The U.S. Supreme Court did not address that type of liability in *Central Bank* and therefore respondeat superior survived *Central Bank of Denver* as a legal principle in section 10(b) litigation. *See Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 101 (2d Cir. 2001) ("The distinction between the case at bar and those cited is that in *Central Bank* and *Wright* there was no allegation that the defendants were agents of the alleged defrauder, acting for the defrauder.")

Second, Credit Suisse contends that the opinion in *Janus Capital Group, Inc. v. First Derivative Traders* forecloses respondeat superior liability. 131 S. Ct. 2296 (2011). The Supreme Court held in that case that "[f]or purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether or how to communicate it." *Id.* at 2302. Applying that rule, the Court concluded that an investment advisor did not "make" the allegedly misleading statements in an investment fund's prospectus because the advisor did not have "ultimate control" or "ultimate authority" over the fund's statements. *Id.* at 2304. Thus, according to CSG, it "can be held primarily liable only for statements that [CSG] itself made, not for statements made by CSS employees on behalf of CSS." (Def.'s Mem. 14.)

CSG merely begs the question of whether CSS was, in fact, making statements on its own behalf or on CSG's. If CSG made the misleading statements through its agent CSS, as the Complaint alleges, *Janus* does not absolve CSG of liability because CSG is the party with ultimate authority for the false statements.

### 4. *Direct liability*

Elbit contends in its opposition papers, if not in its Complaint, that CSG is directly liable for securities fraud because "CSG itself made material misstatements or omissions to Elbit." (Pl.'s Opp. 15; *cf.* Compl. ¶¶ 79-80 (stating that "Credit Suisse Securities brokers" and "Credit Suisse Securities" violated Section 10b-5 and that "Credit Suisse Group is liable for the damage" because CSS was its agent).) Elbit distinguishes this theory of liability from its agency theories of liability. (Pl.'s Opp. 15-16.) Elbit rests its argument on the allegation that CSG "publicly announced that Mr. Tzolov and Mr. Butler had been promoted to the position of director." (Compl. ¶ 16.)

But CSG's announcement is not a basis for attributing Tzolov and Butler's statements directly to CSG. The announcement regarding the promotion indicated that Tzolov and Butler had advanced within "Credit Suisse First Boston," not CSG. (Ex. 3 at 20 to Compl.) Moreover, Elbit does not allege that Tzolov and Butler ever worked for CSG; to the contrary, although it alleges that they worked for the vague "Credit Suisse," it

12

attaches an exhibit specifically identifying them as employees of CSS. (*Compare* Compl. ¶ 12 *with* Ex. 2 to Compl.) Thus, the Complaint alleges no basis—apart from its properly pled theory of actual agency—on which to conclude that CSG made any false statements.

### B. Elbit has adequately alleged that CSG is a control person of CSS.

Elbit has adequately alleged that CSG may be held liable as the "control person" of CSS for the purposes of the Second Cause of Action. Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), creates a cause of action against those alleged to have been "control persons" of those who violate the Exchange Act. "To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007).

#### 1. Control

The indicia of agency identified above also suffice to allege sufficiently that CSG was a control person of CSS. *Accord STMicroelectronics*, 775 F. Supp 2d at 536. In addition to ownership, Elbit has alleged that CSG retained the ability to manage CSS's affairs and, moreover, did so in the aftermath of the fraud. (*See* Compl. ¶¶ 14, 77, 90.)

CSG has not persuaded the Court that CSS, as a broker-dealer, was the exclusive "control person" of the individuals who are alleged to be the primary wrongdoers. CSG cites no authority that limits section 20(a) claims premised on those individual's fraud to the corporate broker-dealer that employed them. The regulations cited by CSG mandate a broker-dealer entity undertake compliance responsibilities. *See* FINRA Rule 3100. Those regulations do not transform broker-dealers into entities beyond the Section 20(a) "control" of others.

### 2. *Culpable participation*

A plaintiff must plead that the "controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person." *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996) (quotation marks and brackets omitted); *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 248-49 (S.D.N.Y. 2010); *see In re Lehman Bros. Mortgage-Backed Sec. Litig.*, 650 F.3d 167, 186 (2d Cir. 2011) (comparing section 15 and section 20 pleading requirements). A plaintiff must allege facts that give rise at least to an inference of conduct approaching recklessness that is "strong" and "cogent" in light of other explanations. *See Tellabs, Inc.*, 551 U.S. at 324; *Poptech, L.P. v. Stewardship Credit Arbitrage Fund, LLC*, 792 F. Supp. 2d 328 (D. Conn. 2011); *Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 248 (S.D.N.Y. 2006) (mental state "approximating recklessness" minimum for Section 20(a) liability). A plaintiff's allegation that a control party culpably participated in a fraud must be stated with particularity. *See* 15 U.S.C. § 78u-4(b)(2); *Poptech*, 792 F. Supp. 2d at 335; *Lapin*, 506 F. Supp. 2d at 248.

The parties dispute whether Elbit has adequately pled culpable participation. But that dispute misses a foundational point: "the general rule is that knowledge acquired by an agent acting within the scope of his agency is imputed to his principal and the latter is bound by such knowledge although the information is never actually communicated to it." *N.Y. Univ. v. First Fin. Ins. Co.*, 322 F.3d 750, 753 n.2 (2d Cir. 2003).

Therefore, "In an agency situation, control person liability is properly pled by pleading control over the agent/primary violator while the agent is acting within the scope of their duties in connection with the illegal acts." *CompuDyne Corp. v. Shane*, 453 F. Supp. 2d 807, 831 (S.D.N.Y. 2006). CSG has therefore "culpably participated" in Tzolov and Butler's fraud if its agent—here, allegedly, CSS—"culpably participated" while acting within the scope of its duties.

To hold otherwise would be to suggest that a corporation's scienter or culpability could not be proven by reference to its agents. That is not the law. "When the defendant is a corporate entity, this means that the pleaded facts must create a strong inference that someone whose intent

14

could be imputed to the corporation acted with the requisite scienter." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008); *see also Teamsters Local 445 Freight Div. Pension Fund*, 531 F.3d at 194 (corporate scienter may nevertheless be pled without adequately alleging scienter of individual defendants). Put another way, the best evidence of CSG's scienter would be that of its alleged agent—here, CSS.

By virtue of the purported agency relationship between CSS and CSG, then, CSG has been alleged to have culpably participated in CSS's fraud.

### C. Elbit has adequately alleged that CSG aided and abetted common law fraud

Elbit has adequately alleged that CSG may be held liable as an aider and abettor of CSS's common law fraud for the purposes of the Third Cause of Action. In order to state a claim for aiding and abetting common law fraud, a plaintiff must allege (1) the existence of a fraud; (2) the defendant's actual knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission. *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292 (2d Cir. 2006).

These requirements have been satisfied. First, the Complaint alleges, at a minimum, that Tzolov and Butler defrauded Tadiran by misrepresenting the nature of the securities they were purchasing for Tadiran's account. (Compl. ¶¶ 2-12.) Second, the Complaint alleges, at the very least, that CSS had actual knowledge of this fraud. "Under New York law, knowledge acquired by an agent acting within the scope of its agency is imputed to the principal, even if the information was never actually communicated."*New York Marine & Gen. Ins. Co. v. Tradeline (L.L.C.)*, 266 F.3d 112, 122 (2d Cir. 2001). Therefore, the Complaint alleges CSG had "actual knowledge" of the fraud by virtue of CSS being CSG's agent. (*See also* Compl. ¶ 72 ("Credit Suisse Group knew from its own documents that [the statement to the Wall Street Journal by the accused brokers' attorney] was patently false.").) Third, the Complaint alleges that "Credit Suisse" covered-up the fraud in the fall of 2007 by misrepresenting the nature of the problem with Tadiran's account and the reason for Tzolov and Butler's departure. (Compl. ¶¶ 8-9, 72-74.) And the Complaint alleges that "Credit

15

Suisse" issued a July 2008 statement that falsely "downplayed the extent of the problem." (Compl. ¶ 72.) These acts, undertaken by CSG or its agent, helped to conceal the fraud and therefore constitute "substantial assistance." *Kaufman v. Cohen*, 307 A.D.2d 113, 126 (1st Dep't 2003).

### D. Elbit has adequately alleged CSG was unjustly enriched.

Elbit has adequately alleged that CSG was unjustly enriched for the purposes of the Fourth Cause of Action. To recover on a claim of unjust enrichment, a plaintiff must show that "(1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182 (2011) (citations and alterations omitted). "The essential inquiry in any action for unjust enrichment is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered." *Id.* (citations and alterations omitted).

Elbit alleges that CSG was unjustly enriched to the extent that "Credit Suisse" (1) obtained the "commissions and other fees on purchases . . . and sales" of the improperly purchased securities (Compl. ¶ 109) and (2) transferred CDO- or CLN-backed securities from its own account to Tadiran's in order to avoid taking a loss on them (*Id.* ¶¶ 82, 110). These allegations suffice to state a claim for unjust enrichment.

As the New York Court of Appeals has recently observed, unjust enrichment recovery lies in cases "in which the defendant, though guilty of no wrongdoing, has received money to which he or she is not entitled." *Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 790 (2012). Elbit has plausibly alleged that is the case here. The fact that CSG is a corporate level removed from CSS does not defeat the plausibility of this claim; unjust enrichment may occur indirectly. *Dodona I, LLC v. Goldman, Sachs & Co.*, 847 F. Supp. 2d 624, 653 (S.D.N.Y. 2012).

### IV. CONCLUSION

For the reasons set forth above, CSG's motion to dismiss the Complaint (Dkt. No. 55) is denied. The Complaint contains sufficient

factual allegations to plausibly conclude that CSS acted as CSG's agent in the transactions at issue. Because the Complaint alleges that an actual agency relationship existed between CSG and CSS, the Court declines to dismiss the Rule 10b-5 claim (First Cause of Action). These same allegations support section 20(a) control person liability (Second Cause of Action), as well as liability for aiding and abetting fraud (Third Cause of Action) and unjust enrichment (Fourth Cause of Action). The Complaint does not, however, adequately allege that CSG cloaked CSS in apparent authority relied upon by Tadiran. The parties are directed to submit to the Court within the next ten days a proposed schedule for the remaining discovery in this action.

Dated:   New York, New York
         January 7, 2013

SO ORDERED:

Sidney H. Stein, U.S.D.J.

17